*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DESI LEE HENDERSON,

Defendant-Appellant.

UNPUBLISHED
May 18, 2023

No. 358579
Saginaw Circuit Court
LC No. 19-046493-FC

Before: MARKEY, P.J., and MURRAY and FEENEY, JJ.

PER CURIAM.

Defendant, Desi Lee Henderson, was convicted by a jury of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) and (2)(b) (sexual penetration by a person 17 years of age or older with a person under 13 years of age), and one count of disseminating sexually explicit material to a minor, MCL 722.675. He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 30 to 50 years' imprisonment for the CSC-I convictions and 4 to 10 years' imprisonment for the dissemination conviction, all to be served concurrently. Defendant appeals by right, alleging ineffective assistance of counsel, an evidentiary error created by an unconstitutional statute, prosecutorial misconduct, instructional error, and multiple sentencing defects. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case came to the attention of authorities on June 22, 2019, when they were first alerted to allegations of sexual abuse committed by defendant, then 48 years old, against the complainant, LJ, who was then eight years old. At trial in July of 2021, the prosecution presented the testimony of LJ, LJ's mother—Mahogany Jakes, LJ's biological sister—DS, who testified, in part, about herself being sexually assaulted by defendant, Officer Justin McGregor, who met with LJ and her mother at a local hospital, and Tammie Gillespie, a sexual assault nurse examiner (SANE) who interviewed and physically examined LJ. Defendant, exercising his constitutional rights, chose not to take the stand or call any witnesses. We note that our discussion of the trial testimony reveals numerous inconsistencies and some disjointed statements. Whether these discrepancies

-1-

reflected the youthful ages of LJ and DS, simple memory lapses due to the passage of time, or intentional misrepresentations was for the jury to assess and resolve, not this panel on appeal.

The prosecution's first witness was LJ. The trial court briefly questioned her to determine whether she knew the difference between the truth and a lie; she did. LJ indicated that she was presently 10 years old. She had at one time resided in a townhouse in the city of Saginaw with defendant, her mother, and LJ's six siblings, the youngest two of whom were defendant's biological children.[1] Defendant is not LJ's biological father. LJ shared a bedroom with one or more of her siblings.

On June 22, 2019, while her mother was at work, eight-year-old LJ was playing games with her siblings when she misbehaved and got into trouble. Defendant was in the basement of the home at the time, and LJ's sister, DS, took her down to the basement and told on her to defendant. LJ testified that her sister then went back upstairs. LJ knew that she was in trouble, and she had received "whoopings" from defendant in the past. Instead, according to LJ, this time defendant did "nasty things" to her. LJ claimed that defendant told her to lie down and that he then put his private part in her private part. LJ further testified, however, that defendant tried to put his private part in her private part but it did not go inside her, although it did hurt. LJ next indicated that defendant put his private part in her bottom and that it hurt. LJ explained that earlier at a different house when she was four years old, defendant had put his private part in her bottom and it had hurt.

LJ proceeded to testify that she never saw defendant's "middle" or private part and that he never put it anywhere else on her body. But she then contended that he had placed his private part in her mouth on one occasion. She never observed anything come out of his private part, although he cleaned up something white with a towel when they were in the basement. LJ asserted that she took a shower or bath afterward. She maintained that she was wiping "everything," even though there was nothing on her that had to be wiped off. LJ did not see any blood, but she said that it did "hurt." After coming upstairs following the sexual assault in the basement on June 22, 2019, LJ phoned her mother at work. LJ testified that she told her mother that defendant was "doing horrible things." At some point, defendant spoke on the phone with Jakes, but LJ did not hear their conversation. According to LJ, after defendant got off the phone with LJ's mother, defendant turned toward her and asked, "Why did you tell?" LJ did not respond. Jakes left work and went home after the phone call. And she then took LJ to the hospital. LJ testified that she was examined and interviewed by a lady at the hospital.

The subject turned to alleged sexual abuse of LJ before June 22, 2019, which began when LJ was four years old. LJ testified that she never spoke to anyone about the sexual assaults before June 22, 2019, because she did not want her brothers to know, she was too little and scared, and because defendant commanded her not to tell anyone what was happening. When asked by the prosecutor how often defendant sexually assaulted her, LJ responded, "I think once a week." LJ

---

[1] The ages of the children, a mix of boys and girls, ranged from 2 to 17 years old.

contended that defendant would put his private part in or on her bottom or vagina and that it hurt. She stated that she did not notice any injuries.

LJ additionally testified that on one occasion defendant showed her a video on her brother's tablet that showed naked males and females touching each other's private parts. Defendant told her to watch it, and it was the first time that she had seen anything like it.

On cross-examination, LJ testified that her mother worked a lot, that defendant would discipline LJ when she misbehaved, that he would whoop and yell at her in the process, and that she was the only one who would get in trouble. LJ posited that she missed her real father, with whom she seldom visited. She did not care for defendant, nor did her brothers and sisters. Indeed, LJ stated that defendant was mean to her and her siblings and that she hated him. LJ asserted that she and her siblings wanted her mother to reunite with LJ's biological father, and LJ had hoped that if defendant left the family home, Jakes and LJ's father would again become a couple. LJ acknowledged that she effectively got defendant removed from the home on the basis of her allegations of sexual abuse.

LJ indicated that after the incident on June 22, 2019, she spoke to the police, to the Child Abuse & Neglect (CAN) Council, and to a lady and other people at the hospital. LJ claimed that defendant sexually touched her on a weekly basis since she was four years old. LJ testified that she loved and confided in her mother, but she never mentioned to her mother that defendant was abusing her starting from age four until the disclosure on June 22, 2019. LJ further acknowledged that even though she learned about "bad" touches in school, she never told her teachers over a period of several years that she was being sexually abused by defendant. LJ also conceded that she never told her siblings about the assaults, that she never yelled out when they were occurring, and that no one ever saw defendant abusing LJ. With respect to the sexual assault on June 22, 2019, LJ acknowledged that she did not yell out for help during the abuse. She also admitted that she told her mother that defendant's and LJ's private parts only touched and not that defendant's privates went inside LJ's privates; she added the "inside" aspect later.

Defense counsel was able to elicit testimony from LJ reflecting inconsistencies in her claims of abuse. At defendant's preliminary examination, LJ accused defendant of making her perform oral sex, yet she had never previously mentioned anything about oral sex to the police, the CAN Council, doctors, or anyone else for that matter during the one-year period between her initial disclosure in June 2019 and the preliminary examination. LJ admitted that she kept adding allegations of sexual abuse. LJ acknowledged that before the preliminary examination, she had informed various persons that the sexual assaults had only occurred a couple of times, but she then changed her story, claiming that defendant assaulted her on a daily basis. She told Children's Protective Services (CPS) that the abuse was occurring every morning. LJ also testified on cross-examination that defendant sexually abused her on a weekly basis.

LJ admitted that she lied to her mother on occasion and that she had been caught by her siblings running around the house with her pants down when defendant was not present. LJ agreed that she had told a doctor that defendant tried to put his private part in LJ but was unable to do so. LJ noted that at times she would scrub her private part real hard while in the shower, which made it red and sore afterwards. LJ did not recall having a vaginal rash on June 22, 2019.

With respect to LJ's seeing a sexually explicit video, defense counsel confronted her with a statement she made to the police that the video showed only women and not men and women. LJ replied that the all-women video was a second video that defendant showed her and that the first video depicted men and women having sex. LJ could not remember when she saw the videos, and she did not tell her mother that defendant had shown her the videos. LJ acknowledged that she only reported seeing one video during her testimony at the preliminary examination.

On redirect examination, LJ observed that defendant was not always mean, that he was nice to her on occasion, and that he would play games with her at times. Apparently to the surprise of the prosecutor, LJ testified that she knew that defendant would go to jail based on her accusations of sexual assault. Contrary to some of LJ's testimony on cross-examination, she now stated that she was never interviewed by the police and that she did not take a shower or a bath after being assaulted by defendant on June 22, 2019—there was no vaginal scrubbing that could have caused any redness at the time. LJ was not aware of any existing vaginal redness on June 22, 2019. Finally, LJ testified that the sexual abuse over the years generally took place in the basement of the home, but every now and then it occurred in LJ's bedroom.

Next to testify was LJ's 15-year-old sister, DS, who was born in September 2005. The trial court briefly questioned her to determine whether she knew the difference between the truth and a lie; she did. DS testified that she lived with her mother, her siblings, and defendant in Saginaw in June of 2019. She had lived in other homes with defendant over the years. Defendant is not her biological father. On June 22, 2019, LJ was acting up; consequently, DS went down to the basement where defendant was present to complain about LJ's behavior. Defendant told DS to get LJ so that he could "whoop" her. Conflicting somewhat with that testimony, DS also testified that defendant took LJ down to the basement. Ultimately, defendant and LJ were the only two persons in the basement. DS testified that defendant and LJ were in the basement a long time, that LJ looked "weird" after coming out of the basement, and that defendant did not exit the basement when LJ came upstairs.

According to DS, she called her mother, Mahogany Jakes, and DS and LJ spoke to their mother about what had occurred in the basement. LJ then took the phone to defendant, who was standing by the basement stairs. As LJ handed him the phone, defendant asked, "Why did you tell her?" DS testified that Jakes came home and told defendant to get out of her house.

DS testified that defendant and LJ, but not the other children, spent a great deal of time in the basement of the house. DS indicated that defendant stayed in the basement most of the time. He did not, however, prevent the children from going to the basement. DS observed that LJ often would not do her assigned chore of cleaning up around the home. DS acknowledged that she did not like defendant and that he was mean and not nice to her.

Leading into the topic that DS had been sexually abused by defendant, DS testified that she was interviewed by a lady regarding LJ and did not mention anything about defendant having abused DS. The prosecution then launched into an examination of DS concerning other-acts evidence, i.e., DS's claims that she had been sexually assaulted by defendant. There was an initial incident in which defendant took her clothes and attempted to pull DS into the basement, but no sexual act occurred. Approximately one week later, defendant grabbed DS and exposed his penis. DS claimed that defendant told her that when she got older, he would teach her how to have sex.

-4-

With respect to the incident, DS testified that defendant's penis touched her buttocks and mouth, that his penis was flaccid and became erect, that "white stuff" came out of his penis, that defendant cleaned up with a towel, that it hurt when defendant tried to put his penis in her buttocks, and that she said "stop," to which defendant responded that DS was "being disrespectful." DS contended that defendant perpetrated sexual abuse often against DS when Jakes was at work. Defendant told DS not to tell anyone of the abuse, which she said stopped when she started having her period around age 11.

DS stated that she tried to avoid defendant and that she told no one about defendant's conduct, except for a cousin, until DS informed her mother after the events of June 22, 2019. DS testified that she sugar-coated the occurrences when speaking to the cousin. After LJ told Jakes about being sexually assaulted on June 22, 2019, Jakes asked DS if defendant had sexually abused her. She initially denied that any abuse had taken place, but DS then disclosed to her mother that defendant had indeed "touched" her.[2] DS did not mention the sexual assaults in an initial forensic interview because she was too embarrassed; however, she did disclose the abuse during a second interview.

On cross-examination, DS testified that defendant disciplined the children while her mother was at work, that he sometimes used a belt when punishing the children, and that DS and her siblings did not like defendant. DS acknowledged that she did not personally observe what allegedly happened in the basement of the family home on June 22, 2019. She did claim that she had witnessed sexual activity between defendant and LJ in the past at their old house, but she conceded that she never told anyone of the witnessed molestation. DS testified that in her first interviews with the CAN Council and CPS she had denied that defendant touched her in a sexual manner. She further testified that in a second interview approximately a year later and after defendant's preliminary examination, she had made claims of sexual abuse perpetrated by defendant against her, which claims were purportedly consistent with her trial testimony.

Continuing with cross-examination, DS stated that while defendant had sexually abused her for a few years, she had not, until the recent disclosures, told her mother, her siblings, her teachers, 911, or the police. DS could not recall when exactly defendant had last "touched" her. Cross-examination concluded with DS's asserting that defendant had sexually assaulted her on a daily basis for four to five years, although, as framed by trial counsel, there was no corroborating or physical evidence to support her assertions.

On redirect examination, DS testified that she once witnessed LJ sitting on defendant's lap and putting Vaseline on LJ's vagina. DS contended that she had not wanted to come into court to testify.

The prosecution next called to the stand LJ's mother, Mahogany Jakes. Jakes testified that she has seven children—two with defendant—that she is LJ and DS's biological mother, that LJ was born on March 2, 2011, that she was in a relationship with defendant from 2014 until June 22,

---

[2] The record is not clear with respect to when exactly DS told her mother about being sexually assaulted by defendant.

2019, that she and defendant had resided together at multiple residences, and that she lived in a home in Saginaw on June 22, 2019. On June 22, 2019, Jakes was at work when she spoke by phone with LJ and DS. She described LJ and DS as both sounding nervous on the phone. Jakes testified that the phone was passed to defendant, and Jakes asked defendant what was "going on?" At first, according to Jakes, defendant played dumb (T 114). But then defendant told her that LJ had pulled defendant's penis out. Incensed, Jakes told defendant that he could not place the blame on LJ. Defendant proceeded to assert that he had just rubbed his penis on or against LJ, including on or against her "privates." Jakes testified that she told defendant to "[g]et out" and that he left the home. Later in the evening of the day of the phone call, she spoke again with defendant, informing him that he was going to jail.

Jakes also personally met with defendant at the place that he was going to reside so that she could return his Bridge card. She also challenged defendant's contention that the children were misbehaving, sarcastically ridiculing him for somehow believing that putting his penis on them was a proper response to bad behavior. Defendant then stated, "I fucked up." But defendant denied engaging in any oral sex with LJ, as well as asserting that he never sexually abused LJ's male siblings. Jakes testified that she contacted the police after speaking to LJ and DS on the phone, informing the police that she was taking LJ to the hospital. She met with the police at Covenant Hospital, and LJ was examined. Jakes indicated that all of the children were taken to the CAN Council for interviews. She noted that she was not present for any of the interviews with LJ or the other children. In all, Jakes spoke to the police, CPS, and the CAN Council regarding the alleged sexual assault. Jakes claimed that she told LJ not to take a bath or a shower on June 22, 2019, ostensibly during or after the phone call with LJ and DS and before going to the hospital.

Jakes testified that defendant typically stayed at home while she worked, that he only worked sporadically, that the youngest children were in daycare, and that, with her approval, defendant had the responsibility of disciplining the children. Jakes explained that before June 22, 2019, LJ acted out quite a bit. She observed that LJ often failed to complete her cleaning chores and would pick fights with her siblings. But Jakes did not see anything of concern in the context of sexual abuse.

On cross-examination, Jakes testified that defendant would "whoop" the children on occasion when disciplining them, at times using a belt. She admitted that the children complained about defendant whooping and yelling at the children. Jakes conceded that up until June 22, 2019, none of the children had lodged sexual-abuse accusations against defendant.[3] Jakes stated that she wanted defendant to go to prison on the basis of LJ's claims. Finally, she denied the use of any narcotics on June 22, 2019, and denied that she was seeing a psychologist or psychiatrist at the time.[4]

---

[3] Jakes did testify that there had been sexual abuse committed against one or some of her children in the past entirely unrelated to defendant.

[4] There was no evidence whatsoever suggesting that Jakes was using narcotics or seeing a mental-health practitioner, and the trial court questioned why defense counsel was raising the issues.

Next to testify was Officer Justin McGregor, a patrol officer for the city of Saginaw. Officer McGregor indicated that he met LJ and Jakes at the hospital on June 23, 2019. He described Jakes as being concerned, upset, and frantic. The officer retrieved LJ's underwear to place into evidence and took a statement from Jakes, but he did not testify with respect to the substance of Jakes's remarks. Officer McGregor never encountered defendant, and he did not go to the family home in an attempt to collect evidence.

The prosecution's final witness was SANE Tammie Gillespie. In June 2019, Gillespie was employed as a SANE at Child & Family Services and at the CAN Council. As a SANE, Gillespie performed physical examinations of alleged victims of sexual assault, both adults and children, and collected evidence. She testified that she had conducted about 25 to 30 examinations of children under the age of 12 and that she had previously testified in court as an expert on three or four occasions. The trial court recognized Gillespie as an expert under MRE 702.[5] Gillespie prepared a report dated June 23, 2019, which was the date of the examination, and the report contained her findings regarding LJ. A dispute arose during Gillespie's testimony concerning the admissibility of statements LJ made to Gillespie in the course of a forensic interview, and the court sustained defendant's hearsay objection. The trial court took under advisement the admissibility of Gillespie's SANE report, and later the prosecution withdrew its effort to have the report admitted into evidence.

During Gillespie's physical examination of LJ, she discovered that there was extreme redness in LJ's vaginal area that was painful to the touch. Gillespie opined that the redness was not a common observation for a child of LJ's age, who was eight at the time. She further testified that the redness could not have been caused by LJ's scrubbing her vaginal area during a shower; however, Gillespie then indicated that she would have had to "scrub extremely hard" to cause such redness. Gillespie stated that the redness could have been caused by trauma to the area, but she could not identify a definitive cause. She revealed that there was no vaginal discharge, that LJ's hymen was intact and normal, and that there was "nothing of note" relative to LJ's anus. But Gillespie explained that the appearance of normality with respect to LJ's hymen and anus did not necessarily mean that there was no trauma or penetration.[6] According to Gillespie, there may have been "surface" penetration, as opposed to "full" or "deep" penetration. She also stated that earlier injuries or trauma may have healed. At the conclusion of her direct examination, Gillespie emphasized that it had not been a "normal" genital examination given the redness and pain, noting that the vaginal area should have been pink.

On cross-examination, Gillespie acknowledged, relative to LJ's physical examination, that no fluids were collected, that there was no foreign pubic hair present, that there was no vaginal or rectal bleeding, and that there were no bruises, tears, scars, lacerations, or cuts to the genital and anal areas. Gillespie did explain that a speculum test could not be performed on a child and that LJ had no pubic hair that could be combed for purposes of obtaining evidence. Gillespie doubted

---

[5] There was no specific mention on the record of the exact area of expertise, but we assume that it was in the field of sexual-abuse examinations and diagnoses, including cases in which child victims were involved.

[6] With respect to LJ's intact hymen, Gillespie asserted that it "doesn't mean anything."

that poor hygiene, aggressive washing, or masturbation caused LJ's vaginal redness. Soap sensitivity could possibly have explained the redness.

Defendant moved for a directed verdict, and the trial court denied the motion. Defendant rested without calling any witnesses. Outside the presence of the jury, the court and the parties discussed the jury instructions. Defendant asked the trial court to instruct the jury on the lesser offenses of CSC-II, MCL 750.520c, and assault with intent to commit CSC involving sexual penetration (AWICSC), MCL 750.520g(1). The trial court denied the requests because, according to the court, the offenses were cognate lesser offenses and not necessarily-included lesser offenses. The trial court did indicate that it would instruct the jury on attempted CSC-I. Next, defendant formally waived his right to testify. Further, an agreement between defendant and his attorney was put on the record, pursuant to which the two noted that they had spoken and decided against calling any physicians or experts on behalf of defendant. The parties made their closing arguments, and the trial court then instructed the jury. We note that the three charges of CSC-I were predicated on penile-anal penetration, penile-vaginal penetration, and penile-oral penetration.

As reflected in defense counsel's closing argument, the defense's theory was that LJ and DS made up the allegations of sexual abuse because they hated defendant and wanted their mother to leave him and reunite with their biological father. Counsel adamantly argued that the evidence established that LJ and DS were simply not credible and that there was no pertinent corroborating physical evidence demonstrating that LJ and DS had been sexually assaulted as they claimed. The jury disagreed. Defendant was convicted of all three counts of CSC-I and one count of disseminating sexually explicit material to a minor.

On August 30, 2021, a sentencing hearing was held. Defense counsel affirmatively indicated that there were no additions or corrections to the presentence investigation report (PSIR), which included a sentencing information sheet setting forth the scoring of the sentencing variables. Defendant maintained his innocence through counsel and chose not to exercise his right to allocution. He was sentenced as a fourth-offense habitual offender to 30 to 50 years' imprisonment for the CSC-I convictions and 4 to 10 years' imprisonment for the dissemination conviction, all to be served concurrently. Defendant was also ordered to register as a sex offender under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, for the remainder of his life. The trial court further imposed lifetime electronic monitoring, state costs of $272, and a $130 crime victim's rights assessment. A judgment of sentence reflecting these rulings was entered on the day of sentencing, August 30, 2021.

In March and April 2022. defendant filed motions for new trial, to correct an invalid sentence, and to vacate or stay the remission of costs. He proffered numerous arguments within each motion. Defendant effectively raised the issues now raised on appeal, along with other issues that were resolved in his favor. Defendant attached to the motion for new trial a letter and report by Dr. Stephen R. Guertin, whom trial counsel had on standby under subpoena at trial but who was not called as a witness per defendant's agreement. Dr. Guertin was an Associate Professor of

Pediatrics at Michigan State University's College of Human Medicine and a physician member of the Child Safety Program—a child abuse evaluation team—at Sparrow Hospital.[7]

A non-evidentiary hearing on the motions was conducted on May 16, 2022. The trial court denied the motion for new trial in its entirety for the reasons set forth at the hearing and in the order denying the motion. In the denial order, the trial court rejected defendant's request for an evidentiary or *Ginther*[8] hearing, concluding that development of the record was unnecessary to resolve whether trial counsel was ineffective. Except for finding in defendant's favor regarding the scoring of Offense Variables (OVs) 8 and 11, the trial court denied the motion to correct an invalid sentence. Finally, the trial court denied defendant's motion to vacate or stay the remission of costs. We will discuss the evidence defendant presented in these motions and the trial court's reasoning for denying the motions in our discussion and resolution of the issues raised on appeal where pertinent to those issues.

Defendant filed a motion to remand in this Court seeking an opportunity to develop a factual record in connection with claims of ineffective assistance of counsel. This Court denied the motion to remand "for failure to persuade the Court of the necessity of a remand at this time." *People v Henderson*, unpublished order of the Court of Appeals, entered October 3, 2022 (Docket No. 358579). This Court indicated that the denial was "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar."[9] *Id.* We now address defendant's arguments on appeal.

## II. ANALYSIS

### A. CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

#### 1. GENERAL PRINCIPLES

---

[7] Dr. Guertin noted in a cover letter that he has "participated in helping to train our local SANE nurses and work[ed] collaboratively with them in [his] clinic and as a physician reviewer and participant for difficult cases which present to the Emergency Department." In his Child Abuse Clinic, Dr. Guertin annually sees approximately 200 to 250 children who are referred for suspected abuse, 90% of which entailed alleged sexual abuse. His letter indicates that he has been qualified in court as an expert in child abuse and testifies once or twice a month in legal proceedings—at least half of the time on behalf of the prosecution. Dr. Guertin claims that he has been qualified and testified as a child abuse expert in at least 20 states.

[8] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[9] Defendant renewed his motion to remand a second time before oral argument. We again denied it. *People v Henderson*, unpublished order of the Court of Appeals, entered April 20, 2023 (Docket No. 358579).

Whether counsel was ineffective presents a mixed question of fact and constitutional law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), our Supreme Court recited the principles that govern a claim of ineffective assistance of counsel:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Quotation marks and citations omitted.]

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). When "no *Ginther* hearing [is] held, review is limited to errors apparent on the record." *People v Jordan*, 275 Mich App 659, 712; 739 NW2d 706 (2007) (citation omitted).

## 2. IMPEACHMENT BY USE OF MEDICAL RECORDS

Defendant first argues that trial counsel was ineffective by failing to impeach LJ with a prior inconsistent statement that was contained in her medical records. According to defendant, a medical document dated June 23, 2019, revealed the following statement by a doctor:

> The patient reports that she was downstairs when her mother's boyfriend unzipped his pants and pulled down her pants. She reports that he tried to stick his penis in her, but was unable to and she got away.[10]

Defendant contends that there was "no strategic reason for trial counsel not to challenge [LJ's] credibility and demonstrate how her story had changed over time." Defendant further maintains that the statement would have supported a jury instruction on AWICSC and would have undermined the requisite CSC-1 element of penetration. Defendant further maintains that impeaching LJ with the statement would have damaged her credibility; therefore, the deficient performance was prejudicial. The prosecution argues that LJ's statement is not truly inconsistent

---

[10] A motion to seal was granted relative to LJ's medical records, and the e-record of the lower court proceedings does not contain the medical document at issue. Nevertheless, the parties do not dispute the existence of the medical document or the language quoted by defendant.

with some of her trial testimony and that, regardless, because the defense theory was that LJ fabricated the allegations of sexual abuse based on her hatred of defendant and her desire to see her biological parents reunite, it was reasonable trial strategy to avoid a reference to a statement that would have corroborated sexual contact between defendant and LJ.

The trial court, noting that defense counsel had "vigorously" cross-examined LJ, ruled that the issue was a matter of trial strategy and that any assumed error was not prejudicial. In its order denying defendant's motion for new trial, the trial court determined that trial counsel's performance did not fall below an objective standard of reasonableness.

"Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

We hold that trial counsel was not ineffective by purportedly failing to impeach LJ with the statement contained in her medical records. We initially note that "sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r). In *People v Whitfield*, 425 Mich 116, 135 n 20; 388 NW2d 206 (1986), our Supreme Court, relying on a decision by this Court, observed:

> In *People v Bristol*, 115 Mich App 236; 320 NW2d 229 (1981), the Court of Appeals considered whether bruising of the labia majora, without other physical evidence, was sufficient to show penetration despite the child victim's intact hymen. We agree with the reasoning of the *Bristol* panel:
>
> "One object of the Legislature in providing for degrees of criminal sexual conduct was to differentiate between sexual acts which affected only the body surfaces of the victim and those which involved intrusion into the body cavities, in the instant case the female 'genital opening.' In view of the fact that the penetration of the labia majora is beyond the body surface, a definition of the female genital opening that excluded the labia would be inconsistent with the ordinary meaning of female genital openings. The fact that the Legislature used 'genital opening' rather than 'vagina' indicates an intent to include the labia. Such a definition is also consistent with that in most other jurisdictions. See 76 ALR3d 163, § 3, p 178." *Id.* at 238.

Clearly and understandably LJ did not grasp the subtleties of the legal meaning of sexual penetration. On direct examination, LJ testified that defendant's private part did *not* go "inside" her private part, while also stating that it "hurt." On cross-examination, LJ conceded that she initially told her mother that defendant's and LJ's private parts only touched and that LJ added the "inside" aspect later. More importantly, during cross-examination of LJ, the following colloquy occurred:

*Q.*     Now, you remember going to the hospital and doctors asked you what happened, and you said at that time that Mr. Henderson tried to put his privates into yours but was unable to do so; is that fair?

*A.*     Yes.

*Q.*     Okay. You did not tell the doctors that when you were at the hospital of any of these other accusations at all, did you? Is that correct?

*A.*     Yes.

Thus, trial counsel did in fact impeach LJ's testimony through reference to statements that she made to doctors at the hospital. It was unnecessary to utilize or try to introduce the medical-record statement in an effort to impeach LJ because she admitted that she essentially informed the doctors that defendant did not stick his penis inside her. See MRE 613(b). Clearly, trial counsel knew of the medical-record statement and assailed LJ's credibility with the information. Additionally, trial counsel, although ultimately unsuccessful, elicited extensive testimony of inconsistencies in LJ's version of events. In sum, we conclude that under these circumstances, trial counsel's performance was not deficient, nor did defendant incur prejudice, because of the alleged failure to impeach LJ with medical records.

### 3. EXPERT DR. STEPHEN R. GUERTIN AND HIS REPORT

Defendant next contends that trial counsel rendered ineffective assistance when he failed to call Dr. Stephen R. Guertin to testify as an expert witness. Defendant argues that Dr. Guertin would have opined that 50% of female children who have never been molested experience vaginal redness and that if LJ's allegations of penile-vaginal penetration were true, Dr. Guertin would absolutely have expected to see evidence of injury to LJ's hymen. Defendant further argues that trial counsel was ineffective for failing to use Dr. Guertin's report during counsel's cross-examination of SANE Gillespie. On these matters, defendant maintains that counsel's performance fell below an objective standard of reasonableness because counsel effectively failed to challenge or undermine Gillespie's testimony despite having the ability to do so through utilization of Dr. Guertin's expertise.

The prosecution asserts that the issue regarding whether counsel was ineffective for failure to call Dr. Guertin as a witness was waived when defendant agreed on the record with counsel not to call Dr. Guertin as a witness. Specifically, the prosecution claims that defendant made an informed decision at trial after consultation with his attorney not to call Dr. Guertin as an expert witness. The prosecution, noting defense counsel's thoroughness in cross-examining the witnesses and the purported limited reach of Dr. Guertin's views, argues that defendant was not deprived of a substantial defense, which must be established to succeed on a claim of ineffective assistance of counsel. The prosecution states that while Dr. Guertin addressed vaginal redness, he ignored Gillespie's additional focus on vaginal irritation and pain. The prosecution also contends that some of Dr. Guertin's expressed opinions were inconsistent with the defense theory that there was no inappropriate touching and that the allegations were entirely fabricated in an effort to have defendant kicked out of the house.

In ruling from the bench, the trial court first determined that the issue regarding whether trial counsel was ineffective for failure to call Dr. Guertin as a witness was waived when defendant agreed with counsel on the record not to call Dr. Guertin as a witness. The court further indicated that even if the issue were not waived, Dr. Guertin's opinion was "largely irrelevant" and would not have made a difference in the case. In an accompanying order rejecting the argument, the trial court, aside from noting the waiver, also found that defendant had not demonstrated that counsel's performance fell below an objective standard of reasonableness. On the record and in its order, the court additionally ruled that defendant failed to establish the requisite prejudice. With respect to the failure to use Dr. Guertin's report when cross-examining SANE Gillespie, the trial court ruled at the hearing that it was not satisfied that the report constituted a learned treatise such that it could be employed during Gillespie's cross-examination. In the order denying the motion for new trial, the court determined that trial counsel's failure to utilize the report did not fall below an objective standard of reasonableness and that there was no prejudice even if counsel's performance was deficient.

Trial counsel's decision to retain an expert witness is generally a matter of trial strategy. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). But "a court cannot insulate the review of counsel's performance by [simply] calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). "Initially, a court must determine whether the strategic choices were made after less than complete investigation, and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quotation marks, citation, and brackets omitted). A decision regarding whether to call or question an expert witness is presumed to be a matter of trial strategy with, and we will not substitute our judgment so long as reasonable professional judgment supported counsel's choice. *People v Posey*, 334 Mich App 338, 352-353; 964 NW2d 862 (2020).

We initially reject the prosecution's contention that the ineffective assistance claim fails because defendant was not deprived of a substantial defense. In an order issued by our Supreme Court in *People v Jurewicz*, 506 Mich 914 (2020), the Court ruled that a defendant is "not required to show, in order to obtain relief for ineffective assistance of counsel, that trial counsel's failure to call witnesses deprived him of a substantial defense." Furthermore, we decline to decide whether defendant waived the argument that counsel was ineffective for failure to call Dr. Guertin as a witness. We acknowledge that an agreement between defendant and his attorney was placed on the record, pursuant to which the two men noted that they had spoken and decided against calling any physicians or experts on defendants behalf. Waiver is the intentional relinquishment of a known right; one who waives his rights may not then seek appellate review of a claimed deprivation of those rights because the waiver has extinguished any error. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). It is also true that counsel cannot harbor error in the lower court and then use that error as an appellate parachute. *People v Kowalski*, 489 Mich 488, 505; 803 NW2d 200 (2011). Here, however, defendant's appellate argument is framed in the context of ineffective assistance of counsel. There has been no *Ginther* hearing, nor has this Court granted requests for one because we do not find that a remand for a *Ginther* hearing is necessary or appropriate.

-13-

We have reviewed Dr. Guertin's report, and one matter that must initially be addressed is the fact that portions of the report concern statements LJ made during her forensic interview with Gillespie. At trial, following defendant's hearsay objection that was sustained, Gillespie was not permitted to substantively testify about her interview of LJ. Additionally, Gillespie's report regarding the interview was not admitted at trial after defendant objected to its introduction, and the prosecutor chose not to pursue admission of the report. Accordingly, we will not consider any part of Dr. Guertin's report that articulates opinions based on the forensic interview.[11] To be fair, defendant relies on portions of Dr. Guertin's report that are properly subject to consideration. In pertinent part, Dr. Guertin stated in his report as follows:

> The only finding was redness of the labia minora which were also painful to the touch. Such redness within a very brief period of time after alleged sexual contact could be from sexual contact. It also could have been from the child's admitted extremely aggressive washing of the area. Redness, however, is seen so commonly in this age group that it has no discriminatory value. On any given day if 100 prepubertal children who had never been sexually molested, were examined, more than 50% of them would have redness of the vulvar area. In other words redness is seen so often normally it has no discriminatory value. In this case it could be from genital to genital contact, but could also be seen as you would expect it to be in a child who had not been abused typical from poor hygiene, or from aggressive washing, [or] from a sensitivity to soap or detergents . . . . Notably, there was no bruising. There were no petechiae. There were no lacerations or abrasions. The hymen was completely intact and without fresh notching or transection. . . . Specifically, the hymen was not injured nor was the posterior fourchette, the two areas most commonly injured when there is genital genital contact.

*  *  *

> It is very important to be specific regarding "intercourse" and "vaginal" penetration. Despite the discrepancies in this child's stories, if you accept that the allegations could be true, the child may not have been describing full penile vaginal intercourse as you or I or the lay public understand it to be (penetration by the penis across the hymen into the vagina). She may have been describing, rather, penetration across the plane of the labia into the vulvar area, but not across the hymen into the vagina.

Additionally, Dr. Guertin makes clear in his report that if there were true intercourse or vaginal penetration acutely or even remotely, it would almost always be physically identifiable in a female child, and the genital examination would not be completely normal as in this case. But he also noted that "[a] normal examination in the setting of penetrating sexual contact which does

---

[11] We will also not delve into Dr. Guertin's discussions regarding analysis of or opinions based on the forensic interviews of LJ's siblings.

-14-

not rise to the extent of penile vaginal intercourse would be expected both remotely and acutely if penetration was incomplete."

SANE Gillespie testified that LJ's extreme vaginal redness was not a common observation in a child of her age, but Dr. Guertin indicated in his report that such redness is fairly normal and would be seen in 50% of prepubertal children who had not been sexually abused. Yet Dr. Guertin also acknowledged that "redness within a very brief period of time after alleged sexual contact could be from sexual contact." In this case, there was a "brief" period between the alleged sexual contact on June 22, 2019, and LJ's physical examination by Gillespie. Dr. Guertin noted that vaginal redness could be from extremely aggressive washing of the area, and while Gillespie was doubtful of a connection between washing and redness, she did concede that vaginal redness could possibly be produced if one were to "scrub extremely hard." It is clear from Gillespie's testimony that the extreme vaginal redness *plus* the pain experienced by LJ when the area was palpated led to Gillespie's opinion that there was trauma to LJ's vaginal area. Although Dr. Guertin acknowledged the finding of pain, he failed to address its significance or the possible causes of the pain, especially when considered in conjunction with the vaginal redness. In light of Dr. Guertin's report (1) that accepted the possibility that vaginal redness could have resulted from recent sexual contact, (2) that did not really diverge from Gillespie's testimony on the issue whether extreme scrubbing caused the redness, and (3) that did not appear to take into consideration the accompanying vaginal pain on palpation, possibly opening Dr. Guertin up to damaging cross-examination, we cannot conclude that trial counsel's failure to call Dr. Guertin as a witness fell below an objective standard of reasonableness.[12] Although other aspects of Dr. Guertin's report may have benefitted the defense, defendant has not overcome the strong presumption that counsel's performance constituted sound trial strategy. *Carbin*, 463 Mich at 600.

With respect to defendant's argument that if LJ's allegations of penile-vaginal penetration were true, Dr. Guertin would have absolutely expected to see evidence of injury to LJ's hymen, SANE Gillespie actually provided testimony of a comparable nature. Gillespie testified as follows:

> *Q.* Okay. Could you explain why it's possible that there would not be an injury?
>
> *A.* Possibly no penetration - - no deep penetration.
>
> *Q.* Okay.
>
> *A.* You know, it could just be surface.

Dr. Guertin acknowledged that LJ "may have been describing . . . penetration across the plane of the labia into the vulvar area, but not across the hymen into the vagina." At no point in her

---

[12] We cannot help but note that even if LJ's vaginal redness was solely attributable to her taking a shower or bath and intensely scrubbing the vaginal area, it does not necessarily mean that there was no sexual penetration. To the contrary, it begs the question why did the eight-year-old child feel compelled to scrub her vagina so aggressively after being alone with defendant in the basement?

testimony did Gillespie expressly indicate that LJ's hymen would have been intact and normal if she had experienced full penile-vaginal intercourse.

As with the issue of LJ's vaginal redness, calling Dr. Guertin to take the stand could easily have backfired: Dr. Guertin potentially could have agreed with Gillespie regarding surface penetration, i.e., "penetration across the plane of the labia into the vulvar area," which would constitute intrusion into the genital opening for purposes of CSC-I. See MCL 750.520a(r); *Whitfield*, 425 Mich at 135 n 20. Accordingly, we cannot conclude that trial counsel's failure to call Dr. Guertin to testify fell below an objective standard of reasonableness.

Moreover, Dr. Guertin's report contained nothing that would have benefitted defendant in relation to LJ's claim of penile-oral penetration. And on the issue of penile-anal penetration, Dr. Guertin's testimony may have even damaged the defense. In his report, Dr. Guertin stated that in a "study from 2000 of prepubertal kids who alleged sexual assault, and the majority were examined within 72 hours, only 17% of those who alleged genital anal contact had anal injury." He further observed that "[a] normal anal exam done months after alleged sodomy cannot be used as proof that sodomy did not occur remotely." Dr. Guertin additionally indicated that "[a] normal examination performed acutely after an allegation of genital-anal contact in prepubertal children is less likely to be abnormal than after a similar allegation in adults[.]" Finally, had Dr. Guertin testified on behalf of defendant, the focus of the trial could easily have become whether there were merely penile-vaginal contact or penile-vaginal penetration, distracting the jury from the defense theory that there was no penetration or contact whatsoever and that the allegations were completely fabricated.

With respect to the claim of ineffective assistance of counsel for failure to use Dr. Guertin's report when cross-examining Gillespie, defendant fails to provide a legal framework under the rules of evidence that would have allowed his attorney to utilize the report during cross-examination. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998). The trial court ruled that it was not satisfied that the report constituted a learned treatise such that it could be employed during Gillespie's cross-examination. On appeal, defendant does not challenge the trial court's reasoning for rejecting this particular ineffective assistance claim. "When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015). Accordingly, we reject defendant's argument.

Furthermore, even on substantive review, defendant's argument lacks merit. MRE 707 provides:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only.

Dr. Guertin's report does not fall within the parameters of MRE 707. Additionally, for the reasons discussed above in rejecting defendant's argument that trial counsel was ineffective for failing to call Dr. Guertin, we cannot conclude that defendant would have been able to effectively impeach Gillespie with reference to the information in Dr. Guertin's report. We therefore hold that defendant has failed to demonstrate deficient performance or the requisite prejudice.

## B. PROSECUTORIAL MISCONDUCT

Defendant next argues that he was denied his constitutional right to a fair trial when the prosecutor improperly asked SANE Gillespie to give her opinion regarding whether vaginal redness can be caused by scrubbing in the shower. Defendant contends that "[a]n untrained layperson can determine intelligently whether scrubbing in the shower can cause redness without the help of an expert witness." But in his next breath, defendant maintains that "Gillespie was not qualified to give expert testimony about the anatomy of female children" and could only give expert testimony on nurse examinations of alleged sexual assault victims. Defendant asserts that the prosecutor committed misconduct by asking a question for which the answer necessarily fell outside the scope of Gillespie's field of expertise. In an associated argument, defendant posits that trial counsel was ineffective for failing to object to the questioning. The prosecution notes that Gillespie repeatedly admitted that she could not discern what exactly caused the vaginal redness. The prosecution further indicates that there was nothing improper about the question and that there was no evidence that LJ even took a shower in the period immediately preceding the examination. The prosecution additionally argues that defendant has failed to demonstrate the requisite prejudice assuming prosecutorial misconduct or deficient performance by counsel.

At the hearing on the motion for new trial, the court found that Gillespie did not offer improper opinion testimony; rather, she merely testified that LJ's vaginal redness was not caused by scrubbing during a bath or shower while acknowledging that she could not determine the cause of the redness. The trial court also ruled that defendant failed to demonstrate any prejudice caused by Gillespie's opinion testimony. In the order denying the motion for new trial, the trial court observed that Gillespie had not vouched for LJ's credibility, nor had she commented on defendant's guilt or innocence.

In *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007), this Court explained the general principles regarding prosecutorial misconduct:

> Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence. Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context. The propriety of a prosecutor's remarks depends on all the facts of the case. A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. [Quotation marks and citations omitted.]

"A finding of prosecutorial misconduct may not be based on a prosecutor's good-faith effort to admit evidence." *Id.* at 76.

We conclude that there was no prosecutorial misconduct or ineffective assistance of counsel; the prosecutor engaged in a good-faith effort to admit evidence. We initially note that there was conflicting evidence regarding whether LJ bathed or showered after the alleged sexual assault and before the physical examination by Gillespie. Moreover, there is absolutely no analytical development of defendant's contention or suggestion that expert testimony on the matter was improper.[13] As noted earlier, "[i]t is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mudge*, 458 Mich at 105. We also note that Gillespie acknowledged that "[t]o have that type of redness all around her vaginal area, you would have to scrub extremely hard, extremely hard." Thus, she ultimately did not claim that it was impossible for the redness to have come from scrubbing during a shower, although she did not believe that such was the case. And LJ did testify, at least at one point, that she showered aggressively after the sexual assault on June 22, 2019. Gillespie testified on both direct- and cross-examination that she could not say what exactly caused LJ's vaginal redness.

With respect to whether Gillespie testified outside the area of her expertise when she opined that the vaginal redness was not caused by scrubbing during a shower, we conclude that offering an opinion excluding a possible source of vaginal redness in a child falls within the expertise of a sexual assault nurse examiner who has experience conducting physical examinations of child CSC victims. Even were we to find that the issue presents a close call, we cannot conclude that the question posed by the prosecutor reflected bad faith or an intentional effort to elicit inadmissible testimony. Furthermore, because we believe that the prosecutor's examination of Gillespie was proper, we hold that trial counsel was not ineffective for failing to object to the question concerning vaginal redness. See *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015) (counsel is not ineffective for failing to raise a meritless or futile objection). And assuming deficient performance, defendant has failed to demonstrate any prejudice, especially considering that Gillespie waivered and acknowledged that extreme scrubbing could have caused LJ's redness. *Carbin,* 463 Mich at 600. Reversal is unwarranted.

---

[13] MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

## C. CONSTITUTIONALITY OF MCL 768.27a

Defendant argues that MCL 768.27a, which provides for the admission of other-acts evidence concerning sexual offenses committed against minors, is unconstitutional and that its application allowing the admission of evidence of LJ's sister's claims of sexual abuse by defendant violated his due process rights. More particularly, defendant states:

> Uprooting the rules of evidence may be effective in securing convictions, but it also brings into question the integrity of the criminal legal system. MCL 768.27a undermines the long-standing principles on which the rules of evidence are based and perpetuates stereotypes about people charged with sexual offenses.

> The admission of other acts under MCL 768.27a was fundamentally unfair to [defendant] because the statute itself is based on the improper presumption that prior allegations prove he was—and therefore is—guilty.

The trial court rejected the argument, concluding that the Michigan Supreme Court in *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012), held that MCL 768.27a is constitutional. The prosecution relies on *Watkins* in responding to defendant's appellate argument.

"Constitutional questions and issues of statutory interpretation are questions of law, which this Court reviews de novo." *Watkins*, 491 Mich at 466-467. MCL 768.27a(1) provides, in part, that "in a criminal case in which the defendant is accused of committing a listed [sexual] offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant."

Our Supreme Court in *Watkins* held that MCL 768.27a, even though silent with respect to whether MRE 403 applies to the statute, "remains subject to MRE 403, which provides that a court may exclude relevant evidence if the danger of unfair prejudice, among other considerations, outweighs the evidence's probative value." *Watkins*, 491 Mich at 456. Here, defendant's argument, which is cursory, fails to acknowledge the incorporation of MRE 403 into MCL 768.27a; therefore, the due process argument lacks a full and pertinent analysis. The *Watkins* Court held that it "need not address whether, if evidence admissible under MCL 768.27a were not subject to MRE 403, the statute would violate a defendant's due-process right to a fair trial or interfere with the judicial power to ensure that a criminal defendant receives a fair trial." *Watkins*, 491 Mich at 456 n 2. This holding reflects that there is no due process problem with MCL 768.27a so long as MRE 403 is applied when determining whether other-acts evidence is admissible. Furthermore, defendant entirely ignores *Watkins* even though the trial court relied on *Watkins* in rendering its ruling. Again, "[w]hen an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof*, 311 Mich App at 521. Defendant has not demonstrated that he is entitled to reversal on this issue.

## D. CLAIMS OF INSTRUCTIONAL ERROR

Defendant argues that the trial court erred by denying his request for a jury instruction on the lesser offense of AWICSC, which error prejudiced defendant. Defendant maintains that AWICSC is a necessarily-included lesser offense of CSC-I and that a rational view of the evidence

supported an instruction on AWICSC. Defendant acknowledges that the CSC-I charge brought by the prosecutor did not have an express element requiring proof of force or coercion; however, when addressing sexual penetration with a victim under 13 years of age, a lack of consent is implied and coercion is therefore necessarily involved, effectively making the crime assaultive in nature. Defendant further contends that the trial court erred by denying his request for a jury instruction on the lesser offense of CSC-II, MCL 750.520c. He asserts that five Justices in *People v Nyx*, 479 Mich 112; 734 NW2d 548 (2007), concluded that CSC-II is a necessarily-included lesser offense of CSC-I or that it is an "inferior" offense in comparison to CSC-I. Therefore, the trial court's failure in this case to instruct on CSC-II constituted error. In the alternative, to the extent that *People v Cornell*, 466 Mich 335; 646 NW2d 127 (2002), barred an instruction on CSC-II, defendant maintains that *Cornell* was wrongly decided and should be overruled. The prosecution argues that CSC-II is not a necessarily-included lesser offense of CSC-I when the CSC-I charge is predicated on sexual penetration of a person under 13 years of age. And the prosecution contends that AWICSC is not a necessarily-included lesser offense of CSC-I. According to the prosecution, because the requested instructions concerned cognate lesser offenses, the trial court was precluded as a matter of law from instructing the jury on AWICSC and CSC-II.

The trial court ruled from the bench that AWICSC is a cognate lesser offense of CSC-I as charged under the particular circumstances of this case, i.e., sexual penetration of a person under 13 years of age, with no need to prove force or coercion. Therefore, because Supreme Court precedent dictates that cognate lesser offenses cannot be presented to a jury for consideration, there was no instructional error on the matter. The trial court's order denying the motion for new trial was consistent with its ruling from the bench. With respect to an instruction on CSC-II, the court similarly found at the hearing and in its accompanying order that CSC-II is a cognate lesser offense of CSC-I; therefore, no instruction on CSC-II could be given to the jury. The trial court further ruled that it lacked the authority to overrule Supreme Court precedent that barred instructions on cognate lesser offenses.

In *People v Everett*, 318 Mich App 511, 528-529; 899 NW2d 94 (2017), this Court observed:

> We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion. Even when instructional error occurs, reversal is warranted only if after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative. The defendant bears the burden of establishing that the error undermined the reliability of the verdict. [Quotation marks, citations, and brackets omitted.]

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him. Accordingly, jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *Id.* at 527 (quotation marks and citations omitted). In *People v Jones*, 497 Mich 155, 163-165; 860 NW2d 112 (2014), the Michigan Supreme Court explained:

-20-

In *People v Cornell*, this Court considered what crimes constitute lesser or "inferior" offenses within the meaning of MCL 768.32(1).[14] After reviewing the dissonant approaches to lesser-included-offense instructions articulated throughout our jurisprudence, this Court noted that the word "inferior" in the statute does not refer to inferiority in the penalty associated with the offense, but, rather, to the absence of an element that distinguishes the charged offense from the lesser offense. On this basis, this Court concluded that a defendant is entitled to a lesser offense instruction only if that lesser offense is necessarily included in the greater offense; that is, the offense must be committed as part of the greater offense insofar as it would be impossible to commit the greater offense without first committing the lesser offense. *Cornell* thus interpreted the legislative prerogative contained in MCL 768.32(1)—that an included-inferior-offense instruction may be appropriate upon request—as limited to necessarily included lesser offenses only; it foreclosed consideration of cognate lesser offenses, which, in the absence of adequate notice, may violate a defendant's fundamental due process rights. Under *Cornell*, then, the rule of lesser included offenses is simple: pursuant to MCL 768.32(1), the court must first determine whether an offense is necessarily included, which requires a comparison of the elements of the offenses, and if so, the court must then determine whether an instruction is warranted on the facts of a particular case by examining whether the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support the instruction.

As a corollary of this conclusion, *Cornell* returned MCL 768.32(1) to its original construction . . .: consideration of cognate lesser offenses is not permitted and the right to an instruction on a necessarily included lesser offense turns on whether the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support the instruction. [Quotation marks, citations, and brackets omitted.]

"The elements of CSC-I under MCL 750.520b(1)(a) are that (1) the defendant engaged in sexual penetration with another person and (2) the other person was under 13 years of age." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). CSC-I is a general intent crime. *People v Nickens*, 470 Mich 622, 631; 685 NW2d 657 (2004). "Assault with intent to commit criminal sexual conduct involving sexual penetration shall be a felony punishable by imprisonment for not

---

[14] MCL 768.32(1) provides:

Except as provided in subsection (2) [certain drug offenses], upon an indictment for an offense, consisting of different degrees, as prescribed in this chapter, the jury, or the judge in a trial without a jury, may find the accused not guilty of the offense in the degree charged in the indictment and may find the accused person guilty of a degree of that offense inferior to that charged in the indictment, or of an attempt to commit that offense.

more than 10 years." MCL 750.520g (1). "[T]he elements of assault with intent to commit CSC involving penetration are simply (1) an assault, and (2) an intent to commit CSC involving sexual penetration." *Nickens*, 470 Mich at 627. Pertinent to this case, "[t]he elements of CSC-II are: (1) the defendant engaged in sexual contact, (2) with a person under 13 years of age." *People v Duenaz*, 306 Mich App 85, 106; 854 NW2d 531 (2014). "Sexual contact" is defined as "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for" revenge, to inflict humiliation, or out of anger. MCL 750.520a(q).

We first address the issue whether the trial court erred by refusing to instruct the jury on AWICSC. In *Nickens*, 470 Mich at 623-624, our Supreme Court held:

> We granted leave to appeal to consider whether assault with intent to commit CSC involving sexual penetration, MCL 750.520g(1), is included within the offense of first-degree CSC involving personal injury and the use of force or coercion to accomplish sexual penetration, MCL 750.520b(1)(f). The Court of Appeals held that because MCL 750.520g(1) was not a necessarily lesser included offense of MCL 750.520b(1)(f), the trial court erred by instructing the jury on the assault offense. We hold that the trial court did not err in its instruction to the jury because the assault offense is a necessarily lesser included offense of first-degree CSC involving personal injury and the use of force or coercion to accomplish sexual penetration. [*Nickens*, 470 Mich at 623-624 (citations omitted).]

Understanding the reasoning employed by the *Nickens* Court is critical to understanding and resolving defendant's argument in this case. The Supreme Court set forth its analysis as follows:

> In every instance where an actor commits CSC-I involving personal injury and uses force or coercion to accomplish sexual penetration, the actor first commits an attempted-battery assault with the intent to commit CSC involving sexual penetration. The term "force or coercion," as contained in MCL 750.520b(1)(f), necessarily contemplates a situation in which an assault has occurred. If, for example, the actor uses physical force to accomplish sexual penetration, a nonconsensual and harmful touching has occurred. Because a battery includes an attempted-battery assault, an assault has also occurred.
>
> Likewise, if the actor overcomes the victim by coercion, a nonconsensual and harmful touching has occurred. The application of force to the person of another is not unlawful,—and, therefore, not a battery—if the recipient consents to what is done, provided this consent (1) is not coerced or obtained by fraud, (2) is given by one legally capable of consenting to such a deed, and (3) does not relate to a matter as to which consent will not be recognized as a matter of law. As such, the criminal law views coerced consent as no consent at all. Thus, if the victim is coerced into agreeing to sexual penetration, the victim cannot be said to have

lawfully consented and, thus, a battery has occurred. Because a battery includes an attempted-battery assault, an assault has also occurred.

> *In sum, nonconsensual sexual penetration with another is, in and of itself, an attempted-battery assault and a battery.* As such, the first prong of MCL 750.520g(1), an assault, is always satisfied when the actor commits CSC-I under MCL 750.520b(1)(f). Moreover, we also believe that the second prong of MCL 750.520g(1), an intent to commit CSC involving sexual penetration, is always satisfied when the actor commits CSC-I under MCL 750.520b(1)(f).

> We can envision no circumstance in which an actor could unintentionally or accidentally use force or coercion to sexually penetrate his victim and, therefore, lacked the necessary mens rea under MCL 750.520g(1) or MCL 750.520b(1)(f). We acknowledge that CSC-I is a general intent crime. We are further cognizant that assault with intent to commit CSC involving sexual penetration may be viewed as a specific intent crime. Under these circumstances, however, this is a distinction without a difference. [*Nickens*, 470 Mich at 630-631 (quotation marks and citations omitted; emphasis added).]

The first question we must tackle is whether CSC-I based on sexual penetration with a person under the age of 13 constitutes nonconsensual sexual penetration, i.e., an assault. Although not cited by defendant, the Supreme Court in *People v Starks*, 473 Mich 227, 229-230; 701 NW2d 136 (2005), answered this question in a manner favorable to defendant in the instant case:

> Further, we reject the argument that the complainant could consent to the act and overrule the incorrect conclusion in *People v Worrell*, 417 Mich 617; 340 NW2d 612 (1983), that consent is always a defense to the crime of assault with intent to commit criminal sexual conduct involving sexual penetration. The complainant, who was thirteen years old at the time of the incident, could not consent to an act of fellatio. *Because a thirteen-year-old child cannot consent to sexual penetration*, consent by such a victim is not a defense to the crime of assault with intent to commit criminal sexual conduct involving sexual penetration.

> Therefore, there was probable cause to believe that defendant committed assault with intent to commit criminal sexual conduct involving sexual penetration and defendant should have been bound over on the charge. [Emphasis added.]

Accordingly, in a case where there is sexual penetration of a person under 13 years old, the penetration is nonconsensual and an assault necessarily occurs. Furthermore, comparable to a CSC-I case based on force or coercion, we can envision no circumstance in which a defendant could unintentionally or accidentally sexually penetrate a victim under the age of 13. Therefore, contrary to the trial court's ruling, *Nickens*, although addressing sexual penetration by the use of force or coercion, is not distinguishable. We conclude that one cannot commit CSC-I involving a victim under the age of 13 without also committing AWICSC. Consequently, AWICSC is a necessarily-included lesser offense of CSC-I when the charge entails sexual penetration of a child under 13 years old. Additionally, a rational view of the evidence supported an instruction on AWICSC. We thus hold that the trial court erred by failing to instruct the jury on AWICSC.

-23-

Nevertheless, we also rule that the error was harmless in light of the fact that the jury was instructed on the offense of attempted CSC-I, upon which the jurors declined to convict. "No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of *misdirection of the jury* . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26 (emphasis added). Under MCL 769.26, nonconstitutional instructional error that is preserved is subject to harmless-error analysis. *People v Schaefer*, 473 Mich 418, 442-443; 703 NW2d 774 (2005). The jury in this case was instructed on attempted CSC-I as follows:

> Under Count I, Count II, and Count III, you may also consider the less serious crime of attempted first-degree criminal sexual conduct. To prove that defendant attempted to commit this crime, the prosecutor must prove the following elements beyond a reasonable doubt:

> First, that the defendant intended to commit first-degree criminal sexual conduct, which was previously defined for you.

> Second: That the defendant took some action toward committing the alleged crime, but failed to complete the crime. . . . In order to qualify as an attempt, the action must go beyond mere preparation to the point where the crime would've been completed if it had not been interrupted by outside circumstances. To qualify as an attempt, the act must clearly and directly be related to the crime the defendant is charged with attempting and not some other objective.

The jury found that there was penile-vaginal, penile-anal, and penile-oral penetration, clearly rejecting any view of the evidence that defendant had only intended and attempted to sexually penetrate LJ. Under these circumstances, it is quite clear that the jury, had it been instructed on AWICSC, would not have found that defendant merely assaulted LJ with an intent to commit CSC involving sexual penetration absent actual penetration. AWICSC and attempted CSC-I are so closely related that the jury's rejection of attempted CSC-I provides us with the confidence that the jurors would not have convicted defendant of AWICSC. In *People v Beach*, 429 Mich 450, 490-491; 418 NW2d 861 (1988), superseded by statute on other grounds by *People v Smith-Anthony*, 494 Mich 669, 687 n 53; 837 NW2d 415 (2013), our Supreme Court observed:

> Because the instruction should have been given, upon the basis of the state of the record, we are presented with the decision whether or not to conclude that this omission was harmless error. . . . Beach was convicted of the greater charged offense of conspiracy to commit armed robbery. If the jury had doubts about her guilt of the charged offense or if it concluded that the defendant was not planning to use force, it could have and undoubtedly would have, found her guilty of the instructed lesser included offense of conspiracy to commit unarmed robbery, which would represent a lesser use of force. Because it did not do so, we can conclude that it had no reasonable doubt as to the defendant's guilt of conspiracy to commit armed robbery. We believe that the jury's decision is a reasonable indication that the failure to give an instruction on the lesser included offense of conspiracy to

commit larceny in a building was not prejudicial to the defendant. We require a fair trial, not a perfect trial.

By analogy, we believe that the jury's decision to convict defendant of three counts of CSC-I while rejecting the offense of attempted CSC-I is a reasonable indication that the failure to give an instruction on AWICSC was not prejudicial and constituted harmless error. We conclude that there was no miscarriage of justice. MCL 769.26.

With respect to whether the trial court erred by denying defendant's request for an instruction on CSC-II, we hold that there was no error. The Michigan Supreme Court has held that CSC-II is a cognate lesser offense of CSC-I. In *People v Lemons*, 454 Mich 234, 253-254; 562 NW2d 447 (1997), our Supreme Court ruled:

> CSC I requires the prosecutor to prove "sexual penetration." CSC II requires the prosecutor to prove "sexual contact." Sexual penetration can be for any purpose. The statute defines sexual contact, however, as touching that can reasonably be construed as being for the purpose of sexual arousal or gratification. Thus, because CSC II requires proof of an intent not required by CSC I—that defendant intended to seek sexual arousal or gratification—CSC II is a cognate lesser offense of CSC I. In short, it is possible to commit CSC I without first having committed CSC II. [Quotation marks and citations omitted.]

Because CSC-II is not a necessarily-included lesser offense of CSC-I but instead a cognate lesser offense, the general rule is that the trial court had no authority under MCL 768.32(1) to instruct the jury on CSC-II. See *Jones*, 497 Mich at 163-165; *Cornell*, 466 Mich at 354-357. Defendant, however, contends that the Supreme Court's ruling in *Nyx*, 479 Mich 112, supports a decision that defendant was entitled to an instruction on CSC-II. We conclude that the four splintered opinions in *Nyx* cannot serve as a basis to reverse the trial court's ruling.

In *Nyx*, 479 Mich at 115-116, the defendant was charged with two counts of CSC-I and was convicted in a bench trial of two counts of CSC-II, and the issue on appeal concerned whether it was proper under MCL 768.32(1) for the court to convict the defendant of the two CSC-II counts. In a lead opinion by CHIEF JUSTICE TAYLOR joined by JUSTICE MARKMAN, they agreed "that MCL 768.32(1) does not allow a defendant to be convicted of cognate lesser offenses even when the Legislature has divided the crime into degrees[,]" such as CSC offenses. *Nyx*, 479 Mich at 136. The two Justices found that CSC-II is indeed a cognate lesser offense of CSC-I. *Id.* JUSTICE CAVANAGH joined by JUSTICE KELLY, while agreeing that the defendant could not be convicted of CSC-II, concluded that "inferior" offenses for purposes of MCL 768.32(1) included any lesser offenses, not just necessarily-included lesser offenses, but that due process was violated in the case because the defendant did not have adequate notice relative to the crime of CSC-II. *Id.* at 142-143.[15] JUSTICE YOUNG joined by JUSTICE WEAVER agreed that under MCL 768.32(1), a trial court

---

[15] JUSTICE CAVANAGH cited his concurring opinion in *People v Mendoza*, 468 Mich 527, 548-549; 664 NW2d 685 (2003), wherein he found that inferior offenses encompass any lesser offenses and

cannot instruct a jury on cognate lesser offenses; however, they came to the conclusion that CSC-II is a necessarily-included lesser offense of CSC-I, not a cognate lesser offense. *Id.* at 143-144. Finally, JUSTICE CORRIGAN stated in her dissenting opinion:

> I would hold that under the plain language of MCL 768.32(1), a fact-finder may convict a defendant of a legislatively denominated inferior degree of the charged offense if a rational view of the evidence supports the conviction. The *Cornell* rule of construction for determining whether an offense is "inferior" does not apply where the Legislature itself has formally divided an offense into degrees. In any event, it appears that CSC II is necessarily included in CSC I, notwithstanding this Court's contrary statement in *Lemons*. [*Nyx*, 479 Mich at 178.]

We simply cannot discern any clear binding rule that emanates from *Nyx*. Three Justices did indicate that CSC-II is a necessarily-included lesser offense of CSC-I. But two Justices determined that CSC-II is a cognate lesser offense of CSC-I, and two additional Justices did not answer that particular question because it was irrelevant to their analysis of MCL 768.32(1). We will abide by the Supreme Court's decisions in *Cornell* and *Lemons*, which have not been overruled, and hold that CSC-II is a cognate lesser offense of CSC-I; therefore, MCL 768.32(1) barred the trial court from instructing the jury on CSC-II. Thus, there was no error by the trial court in denying defendant's request for an instruction on CSC-II.[16]

Finally, preserving an argument for the Supreme Court, defendant contends that to the extent that *Cornell* barred an instruction on CSC-II, *Cornell* was wrongly decided and should be overruled. In *Associated Builders & Contractors v Lansing*, 499 Mich 177, 191; 880 NW2d 765 (2016), our Supreme Court explained that the "Court of Appeals is bound to follow decisions by this Court except where those decisions have clearly been overruled or superseded[.]" *Cornell* has not been overruled or superseded; consequently, we are bound by *Cornell.*

## E. SENTENCING ARGUMENTS

### 1. SCORING OF OFFENSE VARIABLES 3 AND 19

Defendant argues that the trial court erred by assessing 10 points for OV 3 and by assessing 10 points for OV 19. Ten points for OV 3 are properly scored when "[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(1)(d). The phrase " 'requiring medical treatment' refers to the necessity for treatment and not the victim's success in obtaining treatment." MCL 777.33(3). Defendant argues that there was no evidence that LJ suffered a bodily injury requiring medical treatment; rather, she was taken to the hospital by her mother simply because of

---

can be instructed on if there is sufficient evidence to support the inferior or lesser offense. *Nyx*, 479 Mich at 143.

[16] Like our harmless-error analysis in regard to AWICSC, the jury's rejection of the offense of attempted CSC-I strongly indicated that it would have similarly rejected the crime of CSC-II.

the sexual assault in and of itself. The prosecution maintains that there was evidence that LJ had vaginal pain and redness, which sufficed for the 10-point score.

The trial court, citing *People v Barnes*, 332 Mich App 494; 957 NW2d 62 (2020), ruled as follows with respect to OV 3:

> Similarly, here, we have a child who complained of vaginal pain after the assault, underwent a forensic exam, and the SANE nurse during that examination observed vaginal redness that was painful to the touch. On the record in this particular situation, there was medical treatment and prophylactic care was necessary to treat the complainant's injuries. Therefore, OV-3 was properly scored at 10 points in alignment with . . . *Barnes.* [M 26.]

In *People v Horton*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 360726); slip op at 2, this Court stated:

> Under the sentencing guidelines, the trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence. Clear error is established when the appellate court is left with a firm and definite conviction that an error occurred. This Court reviews de novo whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute. In scoring OVs, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination. The trial court may rely on reasonable inferences arising from the record evidence to sustain the scoring of an offense variable. When a preserved scoring error alters the appropriate guidelines range, resentencing is generally required. This Court reviews de novo issues involving the interpretation of the sentencing variables. [Quotation marks, citations, brackets, and ellipses omitted.]

In *Barnes*, 332 Mich App at 500, this Court addressed OV 3 in the context of a CSC case, ruling as follows:

> The evidence on the record was sufficient for the trial court to infer PD had suffered a bodily injury requiring medical treatment. After the sexual assault, an ambulance transported PD to the hospital where she underwent a forensic medical examination. A specially trained nurse observed two injuries to PD's genital area: a point of tenderness measuring 3 by 1 inches on PD's perineum and a point of tenderness measuring about 1¼ by ½ inches on the area just outside PD's anus. While the nurse could not testify with medical certainty that these injuries were the result of the sexual assault, the injuries were consistent with PD's description of the sexual assault.

We cannot conclude that the trial court erred in this case by assessing 10 points for OV 3. SANE Gillespie identified extreme vaginal redness in an eight-year-old child that was painful to the touch. We find that the redness and pain constituted bodily injuries and that they were consistent with LJ's description of the sexual assault. We hold that LJ's injuries qualified as bodily injuries requiring medical treatment and justified the assessment of 10 points for OV 3.

With respect to OV 19, 10 points are properly assessed when "[t]he offender . . . interfered with or attempted to interfere with the administration of justice[.]" MCL 777.49(c). Defendant argues that there was no evidence that he threatened to take action against LJ if she reported the alleged sexual abuse and that she testified that she did not report the abuse because she did not want her brothers to find out. The prosecution contends that 10 points are appropriate when a defendant engages in conduct to hamper, hinder, or obstruct the administration of justice, which occurred in this case when defendant told LJ not to tell anyone about the sexual abuse.

The trial court ruled that OV 19 was properly assessed at 10 points because defendant interfered with the administration of justice by warning LJ not to tell anyone about the sexual abuse.

"OV 19 is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." *People v Sours*, 315 Mich App 346, 349; 890 NW2d 401 (2016). LJ testified that defendant commanded her not to tell anyone about the sexual abuse, which, according to LJ, started when she was four years old and continued for years. This testimony reflected an effort by defendant to avoid being caught and held accountable. We do not view OV 19 as requiring a specific threatened action, e.g., a threat to kill the victim if he or she informs on a defendant, especially in the context of a very young child who is told not to speak to others of the sexual abuse, which warning itself would be threatening and terrifying. It is true that LJ testified that she did not tell anyone about the sexual assaults because she did not want her brothers to find out about the abuse. But her testimony revealed that this was but one of the reasons for her not coming forward. Other reasons also included defendant's directive that she not tell anyone of the abuse. We hold that the trial court did not err by assessing 10 points for OV 19.[17]

## 2. CONSTITUTIONALITY OF MANDATORY LIFETIME REGISTRATION AS A SEX OFFENDER

Defendant next contends that the trial court's sentence requiring defendant to register as a sex offender for the remainder of his life under the SORA constitutes cruel and/or unusual punishment in violation of the state and federal constitutions. Defendant first asserts that the SORA requirement amounts to punishment. Defendant claims that the requirement of lifetime public registration with in-person reporting is an excessively-harsh and unconstitutional penalty given that there is no individualized assessment of risk, that it constitutes a disproportionate sentence, especially as compared to other jurisdictions, and that it does not serve any penological goal, particularly that of rehabilitation. The prosecution argues that lifetime electronic monitoring

---

[17] We note that after the trial court adjusted two other OVs in favor of defendant at the hearing on the motion to vacate defendant's sentences, his total OV score was 115, placing him at OV Level VI, which is the highest level in the grid for Class A offenses and the proper level when the total OV score is 100 or more points. MCL 777.62. If OV 19 should have been scored at zero points instead of 10 points, and if OV 3 should have been assessed 5 points for bodily injury *not* requiring medical treatment, MCL 777.33(1)(e), defendant's total OV score would be 100 points, keeping him at OV Level VI. And if scoring errors do not alter the minimum sentence guidelines range, resentencing is not required. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

is not cruel and/or unusual punishment. The prosecution maintains that lifetime registration is not excessively harsh, that lifetime registration is not a disproportionate sentence, that lifetime monitoring is not disproportionate when compared to registration requirements in other states, and that lifetime registration may serve rehabilitative goals.

The trial court ruled that mandatory lifetime registration as a sex offender does not constitute cruel and/or unusual punishment under the state and federal constitutions. The trial court reasoned that lifetime registration: (1) is not excessively harsh; (2) does not amount to a disproportionate sentence because it is far less burdensome than the other consequences of a CSC-I conviction such as the possibility of a life sentence; (3) is not disproportionate compared to penalties imposed in other states; and (4) has a deterrent effect and advances public safety, even though it is not part of rehabilitation.

Defendant is considered a Tier III offender under the SORA because of his CSC-I convictions, MCL 28.722(v)(*iv*); therefore, he must register as a sex offender for the remainder of his life, MCL 28.725(13). In a recent published opinion issued by this Court in *People v Jarrell*, ___ Mich App ___,___; ___ NW2d ___ (2022) (Docket No. 356070); slip op at 1, 8-12, the panel, after evaluating the four governing factors,[18] held that mandatory lifetime sex offender registration did not constitute cruel or unusual punishment under Const 1963, art 1, § 16, with respect to the defendant who was convicted of two counts of CSC-I. *Jarrell* is binding precedent, MCR 7.215(J)(1), and forecloses a ruling in defendant's favor in this case.[19] Although defendant here presents an argument under the Michigan Constitution *and* the Eighth Amendment of the United States Constitution, "our state Constitution has historically afforded greater bulwarks against barbaric and inhumane punishments" than the federal Constitution. *People v Parks*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 162086); slip op at 10. Accordingly, if Const 1963,

---

[18] The Michigan Supreme Court has explained:

> [I]n evaluating the proportionality of sentences under the "cruel or unusual punishment" clause, [Michigan courts] are required to consider: (1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation . . . ." [*People v Parks*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 162086); slip op at 11 (citations omitted).]

[19] Defendant appears to be making an as-applied challenge to the statute requiring lifetime registration, but to the extent that he is making a facial challenge, it also fails. A facial challenge attacks the statute itself and requires a party to establish that no set of circumstances exists under which the statutory provision would be valid. *People v Johnson*, 336 Mich App 688, 695; 971 NW2d 692 (2021). Defendant's circumstances—being found guilty of three counts of CSC-I involving a victim under the age of 13—fully justify lifetime registration. Therefore, there exists a set of circumstances in which the SORA requirement of lifetime registration would be valid, necessarily deflating any facial challenge.

art 1, § 16, does not support defendant's argument, the argument necessarily fails under the Eighth Amendment.

### 3. CONSTITUTIONALITY OF MANDATORY LIFETIME ELECTRONIC MONITORING

In a cursory argument, defendant further maintains that lifetime electronic monitoring amounts to an unreasonable search under the state and federal constitutions. Defendant argues that the electronic monitoring will invade his privacy for the rest of his life. He contends that "[e]lectronic tethers collect enormous amounts of personal data, weaken the privacy interests an individual holds in his home, infringe on an individual's dignity, and can even scratch or shock the wearer." The prosecution argues that lifetime electronic monitoring does not constitute an unreasonable search under the state and federal Constitutions because the monitored person is not prohibited from traveling, working, or otherwise enjoying the ability to move about as he or she pleases.

The trial court rejected the argument on the basis of this Court's ruling in *People v Hallak*, 310 Mich App 555; 873 NW2d 811 (2015), rev'd in part on other grounds by 499 Mich 879 (2016).

"A person convicted under section 520b or 520c for criminal sexual conduct committed by an individual 17 years old or older against an individual less than 13 years of age shall be sentenced to lifetime electronic monitoring[.]" MCL 750.520n(1). In *Hallak*, 310 Mich App at 577-581, this Court held that lifetime electronic monitoring for persons convicted of criminal sexual conduct against a victim under 13 years of age does not constitute an unreasonable search in violation of the Fourth Amendment.[20] While *Hallak* addressed a defendant who was convicted of CSC-II, the ruling would plainly apply to the more serious offense of CSC-I. Accordingly, the trial court properly rejected defendant's argument that lifetime electronic monitoring amounts to an unreasonable search under the state and federal constitutions.

### 4. IMPOSITION OF COSTS

Finally, defendant argues that we should vacate the imposition of costs imposed on defendant because he is unable to pay those costs and because the costs were assessed pursuant to an unconstitutional statutory scheme. The trial court had imposed state costs of $272 and a $130 crime victim's rights assessment. The prosecution contends that the costs and assessment were mandated by statute and that the trial court lacked any discretion in ordering payment.

The trial court ruled that the governing statute on the payment of costs creates a presumption of nonindigency and that defendant failed to put forth any evidence to rebut the presumption. Therefore, defendant was not entitled to relief on the basis of his financial

---

[20] In this case, defendant asserts his argument under both the state and federal Constitutions. Regardless, the protections against unreasonable searches under the 1963 Michigan Constitution have been construed as coextensive with the Fourth Amendment. *People v Mead*, 503 Mich 205, 212; 931 NW2d 557 (2019).

circumstances. The trial court further ruled that caselaw established that the statutorily-mandated costs and fees do not violate due process.

"The court shall impose the minimum state costs as set forth in [MCL 769.1j]." MCL 769.1k(1)(a). And under MCL 769.1j(1)(a), a court is required to order the payment of $68 for a felony, totaling $272 in costs in this case in light of the four felony convictions. A crime victim's rights assessment of $130 is mandated by MCL 780.905(1)(a). MCL 769.1*l* provides:

> If a prisoner under the jurisdiction of the department of corrections has been ordered to pay any sum of money as described in [MCL 769.1k] and the department of corrections receives an order from the court on a form prescribed by the state court administrative office, the department of corrections shall deduct 50% of the funds received by the prisoner in a month over $50.00 and promptly forward a payment to the court as provided in the order when the amount exceeds $100.00[.]

"MCL 769.1*l* inherently calculates a prisoner's general ability to pay and, in effect, creates a statutory presumption of nonindigency." *People v Jackson*, 483 Mich 271, 295; 769 NW2d 630 (2009).

Defendant argues that *Jackson* was wrongly decided, but, as discussed earlier, we are not at liberty to disregard Supreme Court precedent. See *Associated Builders*, 499 Mich at 191. Defendant contends that, nevertheless, he overcame the presumption, claiming that he is indigent because he had appointed counsel both below and on appeal. He further asserts that he receives limited financial support from loved ones during his incarceration. After determining that pre-enforcement challenges to an order imposing costs are premature, the *Jackson* Court stated that "once enforcement of the fee imposition has begun, and a defendant has made a timely objection based on his claimed inability to pay, the trial courts should evaluate the defendant's ability to pay." *Jackson*, 483 Mich at 292-293. The Supreme Court further ruled:

> [I]f a prisoner believes that his unique individual financial circumstances rebut § 1*l*'s presumption of nonindigency, he may petition the court to reduce or eliminate the amount that the remittance order requires him to pay. However, because we adjudge a prisoner's indigency at the time of enforcement on the basis of manifest hardship and because a prisoner is being provided all significant life necessities by the state, we caution that the imprisoned defendant bears a heavy burden of establishing his extraordinary financial circumstances. While we do not attempt to lay out an extensive formal structure by which trial courts are to review these claims, we do direct that they be guided by MCL 771.3(6)(b), which controls the similar situation in which a probationer seeks remission of costs owed. Specifically, when reviewing a prisoner's claim, lower courts must receive the prisoner's petition and any proofs of his unique and extraordinary financial circumstances. Further, the lower courts should only hold that a prisoner's individual circumstances warrant amending or reducing the remittance order when, in its discretion, it determines that enforcement would work a manifest hardship on the prisoner or his immediate family. The trial courts are under no obligation to hold any formal proceedings. They are only required to amend the remittance order when § 1*l*'s presumption of nonindigency is rebutted with evidence that

enforcement would impose a manifest hardship on the prisoner or his immediate family. [*Id.* at 296-297.]

In this case, the trial court found that defendant failed to present any evidence to rebut the presumption of nonindigency. On appeal, defendant merely argues that he relies on appointed counsel, along with vaguely claiming that he receives limited financial support from loved ones. To the extent that these assertions even constitute "proofs" or evidence, they certainly do not establish unique and extraordinary financial circumstances that work a manifest hardship on defendant. We thus hold that the trial court did not err by rejecting defendant's argument.

With respect to defendant's constitutional challenges, he maintains that the statutory provisions implicated in this case, MCL 769.1k(1)(a), MCL 769.1j(1)(a), and MCL 780.905(1)(a), are unconstitutional because they create an appearance of partiality on the part of the courts and therefore violate due process and they violate separation-of-powers principles. Defendant does not engage in any substantial analysis of these constitutional issues; rather, he directs us to *People v Johnson*, 336 Mich App 688; 971 NW2d 692 (2021), and more specifically the Supreme Court's order granting leave to appeal in *Johnson*, 509 Mich 1094 (2022). This Court addressed the very constitutional arguments raised by defendant in this case, except the focus in *Johnson* concerned court costs under MCL 769.1k(1)(b)(*iii*). *Johnson*, 336 Mich App at 690-691. The *Johnson* panel fully analyzed and rejected the constitutional challenges. *Id.* at 692-705. Here, defendant argues that the Supreme Court's ultimate decision in *Johnson* will be equally applicable to his constitutional challenges. Given that defendant effectively maintains that *Johnson* is applicable, we shall treat *Johnson* as governing, at least for the time being, which requires us to reject defendant's constitutional arguments. MCR 7.215(J)(1).[21]

## III. CONCLUSION

Defendant's claims of ineffective assistance of counsel, evidentiary error created by an unconstitutional statute, prosecutorial misconduct, instructional error, and multiple sentencing defects do not merit reversal. Accordingly, we affirm.

/s/ Jane E. Markey
/s/ Christopher M. Murray
/s/ Kathleen A. Feeney

---

[21] Defendant is plainly preserving the constitutional arguments for later challenge. We do question defendant's belief that the constitutional analysis of court costs would be the same in the context of analyzing state costs and crime victim's rights assessments. It is, however, unnecessary for us to explore the matter in light of defendant's limited argument.